## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

VALERIE TAYLOR,
  *Plaintiff*,

*v.*         CASE NO. 13-CV-13288

COMMISSIONER OF    DISTRICT JUDGE VICTORIA A. ROBERTS
SOCIAL SECURITY,    MAGISTRATE JUDGE CHARLES E. BINDER

  *Defendant*.
_____/

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION[1]

### I. RECOMMENDATION

This Court **RECOMMENDS** that Plaintiff's Motion for Summary Judgment (docket 21) be denied, that Defendant's Motion for Summary Judgment (doc. 22) be granted, and the decision of the Commissioner be **AFFIRMED**.

### II. REPORT

#### A. Introduction and Procedural History

Pursuant to 28 U.S.C. § 636(b)(1)(B), E.D. Mich. LR 72.1(b)(3), and by Notice of Reference, this case was referred to this magistrate judge for the purpose of reviewing the Commissioner's decision denying Plaintiff's claim for a period of disability and disability insurance benefits (DIB), and supplemental security income benefits (SSI). The matter is currently before this Court on cross-motions for summary judgment.[2] (Docs. 21, 22, 23.)

---

[1]The format and style of this Report and Recommendation comply with the requirements of Fed. R. Civ. P. 5.2(c)(2)(B). This Report and Recommendation only addresses the matters at issue in this case and is not intended for publication in an official reporter or to serve as precedent.

[2]The Court has reviewed the pleadings and dispenses with a hearing pursuant to Eastern District of Michigan Local Rule 7.1(f)(2).

Plaintiff filed an application for a period of disability, DIB and SSI on April 7, 2010, alleging that she became unable to work on May 1, 2008. (Transcript, Doc. 15 at 95, 96, 174-75, 176-79.) Plaintiff's initial applications were denied. (Tr. 95-116.) On March 27, 2012, Plaintiff appeared at a hearing before Administrative Law Judge (ALJ) William G. Reamon, who considered the Plaintiff's claims *de novo*. (Tr. 31.) In a decision dated July 11, 2012, the ALJ found that Plaintiff was not under a disability within the meaning of the Social Security Act at any time from May 1, 2008, through the date of the decision. (Tr. 26.) Plaintiff requested Appeals Council review of this decision. (Tr. 7-8.)

The ALJ's decision became the final decision of the Commissioner, *see Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 543-44 (6th Cir. 2004), on June 3, 2013, when the Appeals Council denied Plaintiff's request for review. (Tr. 1-6.) On July 31, 2013, Plaintiff filed the instant suit seeking judicial review of the Commissioner's unfavorable decision.

## B.      Standard of Review

Pursuant to 42 U.S.C. § 405(g), this Court has jurisdiction to review the Commissioner's final decisions. Judicial review of the Commissioner's decisions is limited to determining whether her findings are supported by substantial evidence and whether she employed the proper legal standards. *See Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). Substantial evidence is "more than a scintilla . . . but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007)(quoting *Cutlip v. Sec'y Health and Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)); *see also Richardson v. Perales*, 402 U.S. 389, 401 (1971)(quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)); *Walters*, 127 F.3d at 528. It is not

the function of this Court to try cases *de novo*, resolve conflicts in the evidence or decide questions of credibility. *See Brainard v. Sec'y of Health and Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989); *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).

In determining the existence of substantial evidence, the court must examine the administrative record as a whole. *See Kirk v. Sec'y of Health and Human Servs.*, 667 F.2d 524, 536 (6th Cir. 1981), *cert. denied*, 461 U.S. 957 (1983). If the Commissioner's decision is supported by substantial evidence, it must be affirmed, even if the reviewing court would decide the matter differently, *Kinsella v. Schweiker*, 708 F.2d 1058, 1059 (6th Cir. 1983), and even if substantial evidence also supports another conclusion. *See Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999). "The substantial evidence standard presupposes that there is a 'zone of choice' within which the Commissioner may proceed without interference from the courts." *Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994)(citing *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)(en banc)(citations omitted)).

"Both the court of appeals and the district court may look to any evidence in the record, regardless of whether it has been cited by the Appeals Council." *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001). There is no requirement, however, that either the ALJ or the reviewing court discuss every piece of evidence in the administrative record. *Kornecky v. Comm'r of Soc. Sec.*, 167 Fed. Appx. 496, 508 (6th Cir. 2006)("[a]n ALJ can consider all the evidence without directly addressing in his written decision every piece of evidence submitted by a party")(citations omitted); *Van Der Maas v. Comm'r of Soc. Sec.*, 198 Fed. Appx. 521, 526 (6th Cir. 2006).

**C.    Governing Law**

Disability for purposes of DIB and SSI is defined as the:

[I]nability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.

42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A); 20 C.F.R. §§ 404.1505(a)(DIB), 416.905(a)(SSI).

Plaintiff's Social Security disability determination is to be made through the application of a five-step sequential analysis:

Step One:  If the claimant is currently engaged in substantial gainful activity, benefits are denied without further analysis.

Step Two:  If the claimant does not have a severe impairment or combination of impairments that "significantly limits . . . physical or mental ability to do basic work activities," benefits are denied without further analysis.

Step Three:  If the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the severe impairment meets or equals one of the impairments listed in the regulations, the claimant is conclusively presumed to be disabled regardless of age, education or work experience.

Step Four:  If the claimant is able to perform his or her past relevant work, benefits are denied without further analysis.

Step Five:  Even if the claimant is unable to perform his or her past relevant work, if other work exists in the national economy that plaintiff can perform, in view of his or her age, education, and work experience, benefits are denied.

20 C.F.R. §§ 404.1520, 416.920. *See also Heston,* 245 F.3d at 534. "If the Commissioner makes a dispositive finding at any point in the five-step process, the review terminates." *Colvin v. Barnhart,* 475 F.3d 727, 730 (6th Cir. 2007).

"Through step four, the claimant bears the burden of proving the existence and severity of limitations caused by [his] impairments and the fact that [he] is precluded from performing [his]

past relevant work." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 474 (6th Cir. 2003)(cited with

approval in *Cruse v. Comm'r of Soc. Sec.,* 502 F.3d 532, 540 (6th Cir. 2007)); *see also Boyes v.*

*Sec'y of Health & Human Servs.*, 46 F.3d 510, 512 (6th Cir. 1994)("[c]laimant bears the burden

of proving his entitlement to benefits."). If the analysis reaches the fifth step without a finding that

the claimant is not disabled, the burden transfers to the Commissioner. *See Combs v. Comm'r of*

*Soc. Sec.*, 459 F.3d 640, 643 (6th Cir. 2006). At the fifth step, the Commissioner is required to

show that "other jobs in significant numbers exist in the national economy that [claimant] could

perform given her RFC [residual functional capacity] and considering relevant vocational factors."

*Rogers,* 486 F.3d at 241 (citing 20 C.F.R. § 416.920(a)(4)(v), (g)); *see also* 20 C.F.R. §

404.1520(a)(4)(v), (g).

### D.    ALJ Findings

The ALJ applied the Commissioner's five-step disability analysis to Plaintiff's claim and

found at step one that Plaintiff met the insured status requirements through December 31, 2013,

and had not engaged in substantial gainful activity since May 1, 2008, the alleged onset date. (Tr.

14.) At step two, the ALJ found that Plaintiff's mood disorder, anxiety disorder, metatarsaligial

osteoarthritis, bilateral patellar chondromalacia, lower back spondylosis with small midline disc

protrusion without stenosis, obesity, bilateral carpal tunnel syndrome and bilateral trochanteric

bursitis were "severe" within the meaning of the second sequential step. (Tr. 14.) At step three,

the ALJ found no evidence that Plaintiff's combination of impairments met or equaled one of the

listings in the regulations. (Tr. 16-19.) The ALJ found that Plaintiff had the residual functional

capacity (RFC) to perform light work as defined in the Regulations[3] with the following additional limitations:

> [S]he is limited to standing or walking for a total of 2 hours in an 8-hour workday; sitting about 6 hours in an 8-hour work day(sic); climbing ramps/stairs occasionally; no climbing ladders, ropes or scaffolds; and occasional stooping, kneeling, crouching, and crawling. The claimant is further limited to simple, routine tasks work; occasional interaction with general public; and the ability to wear splints on the hands and wrists. (Tr. 19.)

At step four, the ALJ found that Plaintiff was unable to perform her past relevant work as a certified nurse's aide (semi-skilled, medium exertion per the Dictionary of Occupational Titles (DOT), heavy exertion as Plaintiff performed it); assembler (SVP 2, medium exertion, unskilled); hotel desk clerk (semi-skilled, light exertion per DOT, medium exertion as Plaintiff performed it); housekeeper (unskilled, SVP 2, light exertion); financial services representative (sedentary exertion per DOT, light exertion per Plaintiff). (Tr. 25, 85-86.) At step five, the ALJ found that Plaintiff could perform jobs existing in significant numbers in the national economy and therefore she was not suffering from a disability under the Social Security Act at any time from May 1, 2008. (Tr. 26.)

### E.   Administrative Record

The medical evidence of record has been reviewed and is set forth below where it is relevant to the analysis. Plaintiff was 38 years old at the time of the ALJ hearing. (Tr. 31, 35.) At the hearing, Plaintiff testified that she had not worked since May 2008. Upon questioning by the ALJ, she agreed that she had last received unemployment benefits in 2010. (Tr. 36-37.) Plaintiff

---

[3]Light work is defined as
> [L]ifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. 20 C.F.R. §§ 404.1567(b), 416.967(b).

has a background as a CNA, but is no longer licensed. (Tr. 39.) She has worked several jobs in the past, including at several factory jobs, in housekeeping and at the front desk in a hotel, at a financial company and in car sales. (Tr. 39, 41, 45-46.)

Plaintiff is married and testified that she lived between her mother's and brothers' homes. (Tr. 36.) She testified that she moved to her mother's side of the state when her mother was diagnosed with cancer. (Tr. 38.) Plaintiff testified that she did not move to help her mother out, but for her mother to help her. (Tr. 38.) Plaintiff has a driver's license and sometimes drives. (Tr. 37.)

Plaintiff complained of back, shoulder and hip pain. (Tr. 50-51.) She testified that she weighs 335 pounds. (Tr. 57.) She testified that when she stopped working she weighed about 250 pounds. (*Id.*) She explained that she has trouble standing for long periods of time. (Tr. 54.) Plaintiff testified that she takes Vicodin and Naproxen for pain, Xanax for anxiety, and Effexor for depression. (Tr. 51.) Plaintiff explained at the hearing that she was wearing wrist splints for tendinitis and her hands "lock up." (Tr. 54.) She testified that since she started wearing them, her hands have not been feeling numb and tingly. (Tr. 83.) The ALJ noted that Plaintiff had brought a four-legged walker to the hearing. (Tr. 54.) Plaintiff testified that one of her doctors, Dr. Moorman, gave her a prescription for it because she had leg cramps as a result of having injections in her arms. (Tr. 54.) She had been using that walker for about one month at the time of the hearing. (Tr. 82.) She later explained that she had called the doctor and asked for the walker when her back gave out, and by the time of the hearing, she still had not seen the doctor since she got the walker. (Tr. 69-70.)

She testified that she has trouble sleeping due to pain in her shoulders and hips making it difficult to find a comfortable position in which to sleep. (Tr. 55.) She explained that she has

7

trouble lifting things due to her to her rotator cuff. (Tr. 55.) She described pain in her feet, ankles, and knees, with ankle swelling if she stands too long. (Tr. 56.) She testified that she has diabetes for which she takes medication including an injection. (Tr. 56-57.)

Plaintiff testified that if she sits for an hour, she has aching in her back and down her legs and she would have to change position. (Tr. 60.) She testified that she cannot stand for more than 10 or 15 minutes and she cannot walk for long. (Tr. 61.) She can lift a gallon of milk. (Tr. 62.) She testified that she is stiff in the morning when she awakens and she has the walker right next to the bed. (Tr. 62.) She testified that she has three to four bad days per week, when she does not go anywhere. (Tr. 63.)

A vocational expert (VE) testified at the hearing. (Tr. 85.) The ALJ asked the VE whether there would be work available for an individual of Plaintiff's age and education who needed to stay home three days a month and "would have to recline for about an hour a day for at least half the other days of the month." (Tr. 86-87.) The VE testified that such a limitation would be work preclusive. (Tr. 87.)

The ALJ then asked the VE to consider an individual limited to:

> [L]ight work with no more than two hours in an eight hour day of combined standing and/or walking, but sitting of about six hours. . . . [O]nly occasionally capable of climbing ramps and stairs; no ladders, ropes, and scaffolds, occasional stooping, kneeling, crouching, crawling. And it does look as though the claimant would be limited to simple routine tasks from a mental standpoint with only occasional general public interaction permitted. (Tr. 87.)

The VE testified that such an individual would not be able to perform Plaintiff's past work. (Tr. 87.) Such an individual would be able to perform the following jobs in the Region defined as Michigan: office helper (6,200 positions); inspection (5,000 positions); and unskilled sales attendant (2,300 positions). (Tr. 85, 87-88.) The ALJ then asked what effect it would have if the

8

same individual were to wear splints on their hands and wrists. (Tr. 88.) The VE testified that the inspection jobs would likely be eliminated; the office helper and sales attendant positions would remain. (*Id.*) An additional job of cashier would be available, in the reduced number of 1,200 positions. (*Id.*)

The ALJ then asked about the use of a walker to get into and out of the work site. (Tr. 89.) The VE testified that it would be allowed to get into and out of the job site, but would not be allowed in manufacturing positions. (Tr. 89.) The VE further testified that "jobs in general will allow you to use it to get in, but not to use it in the performance of your job." (*Id.*) The ALJ asked what jobs would be available to someone with a walker and asked the VE to "assume a sedentary sit/stand kind of physical RFC with the postural limitations that I've suggested here today; the use of the splints, the limitations to simple, routine tasks, and only occasional public interaction." (*Id.*) The VE testified that such an individual could perform sedentary office helper work (about 5,500 positions), information clerk work (about 2,800 positions), and order clerk work (about 3,200 positions). (Tr. 90.) The VE confirmed that her testimony was consistent with the DOT except for the sit/stand positions to which she testified, which were based on her private practice experience including placing individuals at job sites, doing job descriptions at job sites and labor market surveys with employers. (Tr. 91.)

F.    **Analysis**

Plaintiff argues that the ALJ failed to adequately weigh the reports and opinions of Plaintiff's treating doctors. Plaintiff also argues that the RFC is not supported by substantial evidence.

Plaintiff specifically argues that the ALJ "failed to give significant weight to any opinion of record, and therefore substituted his own opinions in this case as to what the Plaintiff was

9

capable of." (Doc. 21 at 12.) Defendant correctly points out that this is not error. There is no requirement that an ALJ must adopt opinions wholesale or not at all. *See generally Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 391-92 (6th Cir. 2004)(finding that the ALJ properly rejected only portions of a treating physician's conclusions and noting it significant that the ALJ did not reject wholesale the doctor's conclusions, but incorporated some of them in the hypothetical questions to the VE). Plaintiff does not argue that controlling weight should have been given to any particular doctor's opinion or conclusion. She merely lists the doctors or reviewers of record and whether or not the ALJ assigned little weight or did not assign any weight. (Doc. 21 at 13.) I will take the allegations in order.

First, Plaintiff argues that "first the ALJ determined that the State Agency Reviewers were entitled to little weight, as they were not acceptable-medical sources (sic)." (Doc. 21 at 13.) The ALJ gave some weight to a State Agency physician who completed a mental residual functional capacity evaluation. (Tr. 23.) The ALJ noted that although the physician was non-examining, the opinion deserved some weight in that it was consistent with other evidence in the record that provided "reasons to reach similar conclusions." (Tr. 23.) The ALJ correctly explained that the physical residual function capacity evaluation was completed by a "single decision-maker" (SDM), not a medical source, and as such, was entitled to no weight. *See generally* SSR 96-6p; *White v. Comm'r of Soc. Sec.*, 2013 WL 4414727 at *8 (E.D.Mich. Aug. 14, 2013)("SDMs, as laypersons, are not qualified to provide medical evidence regarding a claimant's impairment.").

Next, Plaintiff argued that the "ALJ determined that the report of the consultative examiner, hired by the Social Security Administration to examine Plaintiff, Amber Burnett, was entitled to little weight." (Doc. 21 at 13.) Consultative examiner Amber Burnett, Psy.D., Limited Licensed Psychologist, examined Plaintiff on August 11, 2010, and completed a Psychological Medical

Report of the same date. (Tr. 404-10.) The report is signed by supervising licensed psychologist, Lynn N. Lupini, Ph.D. (Tr. 410.) The doctors diagnosed mood disorder, not otherwise specified, and assigned a Global Assessment of Functioning (GAF)[4] of 45. (Tr. 410.) The ALJ identified internal consistencies in the report. (Tr. 23.) Despite assigning a GAF of 45, the ALJ described the symptoms which the doctor recorded as "quite benign." (*Id.*, tr. 410.) For example, the doctor noted that Plaintiff was cooperative, with good hygiene and grooming, her speech was "spontaneous and adequately organized," though her self-concept "appeared impaired." (Tr. 407-08.) The doctor reported adequate contact with reality. (Tr. 407.) The doctor also reported that there was "[n]o evidence of psychomotor retardation or agitation identified," though in the "Additional Information" section at the conclusion of the report, she reported that Plaintiff had presented with agitation and irritability. (Tr. 407, 409.) The ALJ properly explained his reasons for finding this report "less persuasive," including identifying internal inconsistencies. (Tr. 23.)

Plaintiff argues that the ALJ also gave little weight to a psychological evaluation from Dr. Niaz Mohammad. (Tr. 23.) Dr. Niaz Mohammed completed a psychiatric evaluation on March 1, 2012. (Tr. 557-59.) Dr. Mohammad noted that Plaintiff's "memory and abstract were within normal limit" and "she had limited insight and judgment." (Tr. 559.) The doctor diagnosed major depressive disorder, mild, recurrent, ADHD, inattentive type, panic attack with agoraphobia,

---

[4]GAF is a clinician's subjective rating, on a scale of zero to 100, of an individual's overall psychological functioning. At the low end, GAF 1-10 indicates '[p]ersistent danger of severely hurting self or others (e.g., recurrent violence) or persistent inability to maintain minimal personal hygiene or serious suicidal act with clear expectation of death.' *DSM-IV-TR* at 34 (boldface and capitalization omitted). At the high end, GAF 91-100 indicates '[s]uperior functioning in a wide range of activities, life's problems never seem to get out of hand, is sought out by others because of his or her many positive qualities. No symptoms.' *Id.* (boldface omitted). *Kornecky v. Comm'r of Soc. Sec.*, 167 Fed. Appx. 496, 503 n.7 (6th Cir. 2006).

"While a GAF score may be of considerable help to the ALJ in formulating the RFC, it is not essential to the RFC's accuracy. Thus, the ALJ's failure to reference the GAF score in the RFC, standing alone, does not make the RFC inaccurate." *See Howard v. Comm'r of Soc. Sec.*, 276 F.3d 235, 241 (6th Cir. 2002); *see also Kornecky*, 167 Fed. Appx. at 502 n.7 ("A GAF score may help an ALJ assess mental RFC, but it is not raw medical data.").

generalized anxiety disorder, posttraumatic stress disorder related to her past abuse, mild, and "[p]ossible bipolar disorder type II." (Tr. 559.) He also noted "[c]luster B traits, most likely borderline personality" disorder. (Tr. 559.) On examination he noted that Plaintiff was alert and oriented, had no abnormal psychomotor activity, her speech was "soft tone and articulated with good goal direction," mood was sad and her affect was "congruent to her mood," her thought process was "coherent and linear and thought contents were focused towards her depression," her "memory and abstract were within normal limits" and "she had limited insight and judgment." (Tr. 559.) Plaintiff "did not endorse any symptoms of mania, hypomania or psychosis" and she denied hallucinations, and suicidal or homicidal ideation. (Tr. 559.) Dr. Mohammad noted that he "discontinued her Elavil and Abilify, which she claims was not taking anyways," she was to continue taking BuSpar 15 mg twice a day, Xanax 0.25 mg once a day as needed and she was to start Effexor 25 mg twice a day, Saphris 5 mg at bedtime and Adderall 5 mg twice a day.

The ALJ noted that Plaintiff "did not seek psychiatric treatment from a specialist until March 1, 2012, when she underwent a psychological evaluation from Dr. Niaz Mohammed, who assigned the claimant a GAF score of '40-50'." (Tr. 23.) Dr. Mohammad recommended and made some medication changes, but there is no evidence of an ongoing treatment relationship with Dr. Mohammad. As the ALJ pointed out, the doctor's notes appear to be based in large part on Plaintiff's subjective report of symptoms and limitations. (Tr. 23.)

Aside from the GAF scores ranging between 40 and 50, noticeably absent from Plaintiff's brief are allegations of mental limitations opined by Drs. Mohammad or Burnett that were not addressed by the ALJ's RFC or otherwise conflict with the ALJ's findings. Although insight and judgment were reportedly limited in one examination while "self-concept" appeared impaired in the other, neither examiner noted limitations in Plaintiff's participation in the exam, thought

12

process or speech, which would limit participation in work. (Tr. 407, 559.) For example, Dr. Mohammad noted that Plaintiff's thought process was "coherent" and "linear," not unlike Dr. Burnett's note that her speech was spontaneous and adequately organized. In both instances, memory was within normal limits, and suicidal ideation, homicidal ideation and hallucinations were absent. (Tr. 408, 559.) She was cooperative and oriented in both interviews, with notes of fair, good, or appropriate hygiene and grooming. (Tr. 406, 407, 408, 559.) The ALJ gave a reasonable explanation for discounting the GAF scores in each examination and his findings are supported by substantial evidence. In fact, aside from the GAF scores, no actual conflict was identified between these reports and the ALJ's RFC.

Finally, Plaintiff argues that the ALJ failed to assign any weight to Dr. Moorman's opinions. Plaintiff identifies Dr. Moorman as a treating provider. (Doc. 21 at 13.) The record contains an unsigned document containing questions by Plaintiff's attorney and responsive statements by Dr. Haydon Moorman dated February 1, 2012, as well as a version of the same document signed by Dr. Moorman on February 6, 2012. (Tr. 544-48.) Dr. Moorman is a board certified specialist in rheumatology. (Tr. 547.) He stated that he has been treating Plaintiff since July 26, 2010 for the following diagnoses:

> [S]pondylosis which is a mild form of Degenerative Arthritis of the lower back with chronic low back pain, Rotator Cuff Syndrome on both sides with Bursitis and Tendinitis, Bursitis in both hips, Osteoarthritis of the knees, Carpal Tunnel bi-laterally, Chondromalacia Patellae Bi-Laterally, Morbid Obesity, and strain of the feet and ankles with ankle pain. (Tr. 547.)

The doctor explained that despite being tested with a positive rheumatoid factor, Plaintiff is not diagnosed with rheumatoid arthritis because "she does not have symptoms or signs that are consistent with Rheumatoid Arthritis." (Tr. 547.) He explained that "[a]bout 5-10% of the population can have false positive Rheumatoid factor." (*Id.*) He explained that her "weight is a

13

major cause for her problems." (*Id.*) Plaintiff's attorney asked questions that included Plaintiff's indication that she has good and bad days, is unable to leave the house due to pain and fatigue about three days per month on average, has 27 out of 30 days per month that are "hit or miss" and needs unscheduled rest breaks every other day of about 1 hour between 8 a.m. and 5 p.m. to recline, following up each statement of limitations by asking whether this was something that seemed "medically reasonable" considering Plaintiff's diagnoses and/or combination of problems. (Tr. 548.) The doctor responded "yes." (Tr. 548.) The doctor concluded that "[i]f she loses weight, depending on how much she loses, she has an excellent to good prognosis. If she doesn't lose weight or continues to gain weight, she has a poor prognosis." (Tr. 548.)

The opinion of a treating physician should be given controlling weight if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and is "not inconsistent with the other substantial evidence in [the] case record." *Wilson*, 378 F.3d at 544; 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2). "The more a medical source presents relevant evidence to support an opinion, particularly medical signs and laboratory findings, the more weight we will give that opinion. The better an explanation a source provides for an opinion, the more weight we will give that opinion." 20 C.F.R. §§ 404.1527(c)(3), 416.927(c)(3). "Moreover, when the physician is a specialist with respect to the medical condition at issue, . . . her opinion is given more weight than that of a non-specialist." *Johnson v. Comm'r of Soc. Sec.*, 652 F.3d 646, 651 (6th Cir. 2011).

"Claimants are entitled to receive good reasons for the weight accorded their treating sources independent of their substantive right to receive disability benefits." *Smith v. Comm'r of Soc. Sec.*, 482 F.3d 873, 875 (6th Cir. 2007). Therefore, a decision denying benefits "must contain specific reasons for the weight given to the treating source's medical opinion, supported by the

evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's opinion and the reasons for that weight." SSR 96-2p; *see also Rogers*, 486 F.3d at 242.

The ALJ gave a thorough explanation of the "little weight" he accorded Dr. Moorman's opinion. The ALJ specifically addressed the limitations that would affect the ability to perform a consistent workweek or work-month. The ALJ relied on a lack of objective medical evidence to support either the diagnoses or the severe limitations. While the ALJ's reasons are supported by the record, a simpler analysis also supports the ALJ's findings. A "[d]octor's notation in his notes of a claimed symptom or subjective complaint from the patient is not medical evidence; it is the 'opposite of objective medical evidence.' [Thus,] [a]n ALJ is not required to accept the statement as true or to accept as true a physician's opinion based on those assertions." *Masters v. Astrue*, 818 F. Supp. 2d 1054, 1067 (N.D. Ill. 2011). "Otherwise, the hearing would be a useless exercise." *Id.* The limitations set forth in the February 2012 document were actually presented by Plaintiff through her attorney, not the doctor. The doctor merely responded in the affirmative as to whether these limitations are "medically reasonable." He did not come up with the limitations himself, nor did he opine that he had observed the same or that there was actual evidence of the existence of the same. (Tr. 548.) The ALJ properly explained the weight given Dr. Moorman's opinion and the other medical opinions of evidence and his findings are supported by substantial evidence.

Plaintiff also challenges the ALJ's RFC, arguing that she would be unable to perform light work, despite the ALJ's findings to the contrary. (Doc. 21 at 15.) In support of her argument, Plaintiff cites pain and other symptoms, as well as her medical records. She argues that the "ALJ had a duty to consider all of her physical limitations in his Residual Functional Capacity . . . . As

her medical records show, Plaintiff's ongoing pain, tingling, numbness, and persistent headaches would preclude her from performing work activity." (Doc. 21 at 16.)

The record shows that the ALJ considered and discussed these symptoms and conditions. The mere diagnosis of an impairment does not inform the severity of the condition or resultant limitations. *Higgs v. Bowen*, 880 F.2d 483, 489 (6th Cir. 1988). Plaintiff has not identified contradictory evidence of limitations greater than those set forth in the ALJ's RFC. In finding that Plaintiff can perform such a limited range of light work, the ALJ relied on and cited treatment notes of relatively mild objective findings on examination.

> Medical history and objective medical evidence such as evidence of muscle atrophy, reduced joint motion, muscle spasm, sensory and motor disruption, are usually reliable indicators from which to draw reasonable conclusions about the intensity and persistence of pain and the effect such pain may have on the individual's work capacity. Whenever available this type of objective medical evidence must be obtained and must be considered in reaching a conclusion as to whether the individual is under a disability. *Jones v. Sec'y of Health and Human Servs.*, 945 F.2d 1365, 1369-70 (6th Cir. 1991).

The ALJ pointed out that despite Plaintiff's testimony and allegations that she uses a walker, there is no evidence of a prescription and the ALJ cited at least one examination when Plaintiff's gait was reportedly normal on exam. (Tr. 434.) In July 2010, Plaintiff complained of heel pain and reported that she had been on an exercise program and walking on a treadmill. (Tr. 442.) X-rays of the feet revealed an "infracalcaneal spur at the site of the plantar fascia" and a "very small enthesophyte at the insertion site of the Achilles tendon." Custom arch supports, proper shoe gear and home physical therapy exercises were recommended. (Tr. 443.) Notes from September 2011 refer to Plaintiff attending physical therapy. (Tr. 542.) There is no mention in the physical therapy notes of an unstable gait or use of an assistive device to ambulate. (Tr. 550-52.) At the initial physical therapy evaluation, the physical therapist noted that Plaintiff's rehabilitation

potential was "good" for the goals set forth. Yet, as the ALJ pointed out, Plaintiff was not entirely compliant with physical therapy; she was discharged from physical therapy "due to poor attendance." (Tr. 21, 554.)

At an examination in July 2010, shoulders and elbows were unremarkable, the wrists had bilateral normal range of motion without tenderness or pain, Tinel's test was negative bilaterally and Phalen's was positive bilaterally, she had normal range of motion in the knees, with some tenderness in the knees and ankles. (Tr. 15-16, 434.) In the spine she had some limitations in bending, flexing and/or extension in the thoracic or lumbar areas and some groin pain and tenderness in with flexion and rotation in the hips. (*Id.*) She had tenderness in the MTPs of the feet. (*Id.*) As the ALJ pointed out, a July 2010 x-ray of the lumbar spine was reported to be "unremarkable." (Tr. 15, 431, 468.) May 2011 x-rays of the chest following complaints of shortness of breath were normal. (Tr. 519.) An August 2011 MRI of the lumbar spine revealed a "small midline disk protrusion without central canal or foraminal stenosis" at L5-S1, and was an "[o]therwise unremarkable study." (Tr. 15, 507.) Despite the relatively mild findings regarding Plaintiff's back, the ALJ limited her postural activities. The ALJ also limited Plaintiff to no more than two hours of standing or walking in a workday. (Tr. 19, 24.) An August 2011 MRI of the brain following Plaintiff's reports of headaches, stuttering, tremors, dizziness, syncope, nausea, vomiting, lightheadedness, numbness, weakness, visual and hearing changes and forgetfulness, was normal. (Tr. 505-06, 515.)

In May 2011 Plaintiff reported increased back pain and bilateral lower extremity edema. On exam, it was noted that "slight edema" was present bilaterally, with no pitting, cyanosis or skin changes. (Tr. 521.) On examination in 2011 Plaintiff had normal range of motion in the elbows, shoulders, hands and knees with some reported tenderness and pain. (Tr. 15-16, 431.) Wrists were

17

unremarkable on exam. (Tr. 431.) In September 2011, Plaintiff was pursuing bariatric treatment and her nurse practitioner reported that she was a "daily exerciser." (Tr. 304.) The RFC includes the ability to wear wrist splints, which is supported by Dr. Moorman's treatment notes of February 3, 2012, when he wrote a prescription for wrist splints which were to be worn "during the night."[5] (Tr. 576.) He made a note at that time to "rule out carpal tunnel syndrome versus chronic sprain." (Tr. 576.)

The ALJ also cited Plaintiff's November 2011 reaction to corticosteroid shoulder injections, after which she suffered elevated blood sugar and blood pressure, vision problems and muscles cramps, yet he noted that the problems were eventually brought back under control. (Tr. 15, 541.) At that time, Dr. Moorman noted diagnoses of spondylosis, "mild with chronic lower back pain," rotator cuff syndrome, bilateral, inactive, trochanteric bursitis, bilateral, tolerable, diabetes mellitus type 2, "temporarily out of control following injection of her shoulders with corticosteroids," and muscle cramps, "possibly due to hypokalemia caused by corticosteroids and/or osmotic diuresis from hyperglycemia." (Tr. 541.)

Plaintiff had mild elevations in histoplasma titers, which were resolved by April 2011, after which Jason R. Ladwig, M.D., opined that other than this incident, Plaintiff had "no other underlying pulmonary disease." (Tr. 532-33.) Her pulmonary function studies were normal and "[h]er total lung capacity is at the lower limit of normal in a pattern consistent with obesity" with "no other parenchymal abnormality or evidence of obstructive lung disease." (Tr. 532.) The ALJ properly considered the evidence and accounted for those physical limitations which he found credible and supported by the evidence of record.

---

[5] Wrist splints had been prescribed in 2011, yet Plaintiff reportedly lost the prescription and did not fill it. (Tr. 431.)

18

Plaintiff also argues that her mental limitations were not properly accounted for in the ALJ's RFC. The ALJ followed the prescribed rules for evaluating Plaintiff's mental impairments. *See* 20 C.F.R. §§ 404.1520a, 416.920a. The ALJ properly measured the severity of Plaintiff's mental disorder in terms of four functional areas, known as the "B" criteria, by determining the degree of limitation in each area. *See* 20 C.F.R. §§ 404.1520a(c)(3), 416.920a(c)(3). The ALJ determined that Plaintiff had mild limitations in activities of daily living, moderate limitations in social functioning and in maintaining concentration, persistence and pace and that there have been no episodes of decompensation. (Tr. at 17-18.) In making these findings, the ALJ considered the medical opinions and other evidence of record, including Plaintiff's testimony and reports. (Tr. at 17-24.)

The ALJ's findings are also supported by the September 9, 2010 opinion of medical evaluator Ken Lovko, Ph.D. (Tr. 100-01.) Dr. Lovko opined that Plaintiff had mild restriction of activities of daily living and moderate difficulties in both maintaining social functioning and maintaining concentration, persistence or pace. (Tr. 100.) The ALJ's non-exertional limitations to simple, routine tasks and occasional interaction with the general public are also supported by Dr. Lovko's opinion. Despite Plaintiff's reliance on SSR 85-15 for the premise that because the "response to the demands of work is highly individualized, the skill level of a position is not necessarily related to the difficulty an individual will have in meeting the demands of the job. A claimant's condition may make performance of an unskilled job as difficult as an objectively more demanding job." SSR 85-15. In this instance, however, Dr. Lovko's opinion provides evidence that Plaintiff's limitations and difficulties increase with the complexity of the job. (Tr. 103-04.) The doctor opined that Plaintiff's ability to carry out short, simple instructions was not significantly

limited, while her ability to carry out detailed instructions was moderately limited. (Tr. 103.) He

concluded the following:

> The evidence suggests that claimant can understand, remember, and carry-out
> unskilled tasks without special considerations in many work environments. The
> claimant can relate on at least a superficial basis on an ongoing basis with co-workers
> and supervisors. The claimant can attend to task for sufficient periods of time to
> complete tasks. The claimant can manage the stresses involved with unskilled work.
> (Tr. 104.)

Although Plaintiff did not challenge the ALJ's credibility findings, it is also worth noting

that they are supported by substantial evidence, as well. As the ALJ pointed out, Plaintiff's

allegations regarding daily activities have been, at times, inconsistent. (Tr. 21.) The ALJ cited

varying reports of Plaintiff's engagement in exercise, as well as her receipt of unemployment

benefits for at least part of the relevant time period, the severity of her allegations of symptoms

as compared to documentation of relatively mild physical impairments, the noted effectiveness of

medication in her treatment notes, as well as her compliance with medication and therapy. (Tr. 21.)

One of Plaintiff's evaluating and examining doctors noted that Plaintiff reported having twice

attempted suicide as a teenager. (Tr. 558.) At another evaluation, the psychologist noted that

Plaintiff "denied any suicidal ideations or history of suicidal ideation or attempts." (Tr. 408.)

Likewise, her reports of childhood abuse are inconsistent between the evaluations. (Tr. 405, 557.)

With respect to activities of daily living, the record also shows that at a physical therapy

appointment Plaintiff reported that she did not work outside the home, yet performed evangelism

work on the computer. (Tr. 551.)

As set forth above, the record does not contain contradictory evidence of more severe

physical or mental functional limitations than those set forth in the ALJ's RFC. In a hypothetical

question posed to the VE, an ALJ is required to incorporate only those limitations which he finds

credible and supported by the record and the ALJ did so. *See Casey v. Sec'y of Health and Human Serv.*, 987 F.2d 1230, 1235 (6th Cir. 1993). The VE's testimony is substantial evidence supporting the ALJ's finding that Plaintiff could perform a substantial number of jobs in the economy. The ALJ's findings at step five are supported by substantial evidence.

Plaintiff makes a final argument that the ALJ's finding that Plaintiff can perform light work was not harmless error because, "had the ALJ even limited Plaintiff to 'sedentary' work instead of light, an automatic finding of 'disabled' would have resulted according to Appendix 2 to Subpart P of Part 404– Medical Vocational Guidelines, GRID Rule 201.12. Plaintiff was considered 'closely approaching advance (sic) age' on her alleged onset date. She has a high school education." (Doc. 21 at 18.)

This is simply not true. According to the Regulations, a person "closely approaching advanced age" is defined as between the ages of 50 and 54. *See* 20 C.F.R. §§ 404.1563(d), 416.963(d). Plaintiff's alleged onset date was May 1, 2008. Based on the birthdate she gave at her hearing, she would have been only 34 years old at the time of alleged onset and she was 38 years old on the date of the ALJ's decision. (Tr. 35.) She was not a person "closely approaching advanced age" as defined in the Regulations and a finding that she could perform either the full range or a limited range of sedentary work would not have automatically resulted in a finding of disability pursuant to the Regulations.

### G.    Conclusion

The ALJ's decision to deny benefits was within the range of discretion allowed by law, it is supported by substantial evidence and there is simply insufficient evidence to find otherwise. Defendant's Motion for Summary Judgment (doc. 22) should be granted, that of Plaintiff (doc. 21) denied and the decision of the Commissioner affirmed.

## III.   <u>REVIEW</u>

The parties to this action may object to and seek review of this Report and Recommendation within fourteen (14) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140, 106 S. Ct. 466, 88 L. Ed.2d 435 (1985);  *Howard v. Sec'y of Health & Human Servs.,* 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).  The parties are advised that making some objections, but failing to raise others, will not preserve all the objections a party may have to this Report and Recommendation. *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 837 (6th Cir. 2006)(*citing Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987)). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this Magistrate Judge.

Within fourteen (14) days of service of any objecting party's timely filed objections, the opposing party may file a response.  E.D. Mich. LR 72.1(d)(3). The response shall be concise, but commensurate in detail with the objections, and shall address specifically, and in the same order raised, each issue contained within the objections.

s/ Charles E Binder

CHARLES E. BINDER
Dated: December 24, 2014          United States Magistrate Judge